IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 07-00406-01-CR-W-BP |
| MICHAEL PATTERSON, | |
| Defendant. | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO
DEFENDANT'S PRO SE MOTION TO REDUCE SENTENCE
PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i) – COMPASSIONATE RELEASE**

The United States of America, through Teresa A. Moore, United States Attorney for the Western District of Missouri, and the undersigned attorney, provides the following response in opposition to Michael Patterson's ("the defendant") *pro se* motion for compassionate release. The defendant seeks to have his 235-month sentence for felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1) reduced to time served based upon extraordinary and compelling reasons. The defendant argues extraordinary and compelling reasons exist because the coronavirus (COVID-19) places him at risk if the defendant remains in the custody of the Bureau of Prisons (BOP). The defendant also argues he has other extraordinary and compelling reasons for release in that he is going to take care of his mother and son. (D.E. 48.) Because the defendant has not demonstrated extraordinary and compelling reasons justifying a reduction, and because the factors set forth in 18 U.S.C. § 3553(a) do not support a reduction in the defendant's sentence, the Government opposes the request and asks the Court to deny the defendant's motion.

## I. **Procedural History**

On December 5, 2007, the defendant was indicted. (D.E. 5.) On September 4, 2008, the defendant plead guilty to the one-count indictment. (D.E. 34.) On September 12, 2008, the defendant filed a *pro se* motion to withdraw guilty plea. (D.E. 35.) On October 10, 2008, the defendant's *pro se* motion was denied. (D.E. 36.) On March 17, 2009, the defendant was sentenced to a 235-month term of imprisonment followed by five years of supervised release. (D.E. 41.) On June 27, 2016, the defendant filed a motion to vacate under 28 U.S.C. § 2255. (D.E. 45.) The defendant's motion was dismissed on November 7, 2016, as the defendant failed to comply with the Court's order to file a reply to the Government's response. (D.E. 47 and D.E. 10 in case no. 16-CV-00727-BP.) Based upon the information made available on the Bureau of Prisons Inmate Locator, the defendant's release date is August 6, 2024. (*See* https://www.bop.gov/inmateloc/.)

On January 18, 2022, the defendant filed a motion for compassionate release and asserts the coronavirus (COVID-19) places the defendant at risk if he remains in custody. (D.E. 48.) Further, the defendant claims he needs to be released early to provide care for his son and his mother who currently resides in a nursing home. (D.E. 48.) On April 24, 2020, the defendant made a request for compassionate release to the Warden at Victorville FCI. (D.E. 48.) The Warden denied the defendant's reduction in sentence request on May 7, 2020. (D.E. 48.)

## II. **First Step Act**

The First Step Act, effective December 21, 2018, provides inmates the ability to file a motion for compassionate release, an ability previously only vested in the BOP. The statute, 18 U.S.C. § 3582(c)(1)(A), originally permitted judicial relief only upon a motion by the Director of the BOP. Section 603(b) of the First Step Act now permits courts to act "upon motion of the

Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."

Under 18 U.S.C. § 3582(c) a court may not modify a term of imprisonment once it has been imposed except that, under subsection § 3582(c)(1)(A), a court may reduce a term of imprisonment upon finding "extraordinary and compelling reasons," if such reduction is consistent with applicable policy statements of the Sentencing Commission, after considering the factors set forth in 18 U.S.C. § 3553(a), and after determining the defendant is not a danger to the community as provided in 18 U.S.C. § 3142(g). (U.S.S.G. § 1B1.13(2).) The pertinent policy statement, U.S.S.G. § 1B1.13, defines specific medical, age, and family circumstances as possibly justifying a sentencing reduction under this statute, and further authorizes a sentencing reduction based on an extraordinary and compelling circumstance identified by the BOP. (§1B1.13 Commentary n.1(D).)

The Government acknowledges that Courts are divided on the applicability of U.S.S.G. § 1B1.13 when a motion for compassionate release is brought directly by an inmate under the First Step Act, rather than a motion by the Director of the BOP. This division is, at least in part, because the text of § 1B1.13 is tailored to motions specifically brought by the BOP, and the Guideline has not been updated or revised since 18 U.S.C. § 3582(c) was amended to allow inmates to bring motions on their own behalf. Compare *United States v. Warren*, 456 F.Supp.3d 1083, 1084-86 (D. Minn. Jan. 1, 2020), with *United States v. Jones*, 2020 WL 6817488, at *6-9 (6th Cir. Nov. 20, 2020) ("We now join the majority of district courts and the Second Circuit in holding that the passage of the First Step Act rendered § 1B1.13 'inapplicable'

3

to cases where an imprisoned person files a motion for compassionate release.") (citing *United States v. Brooker*, 976 F.3d 228, 234 (2d Cir. 2020). *See also United States v. Gunn*, 2020 WL 6813995, at *1-2 (7th Cir. Nov. 20, 2020).

The Eighth Circuit has not yet decided this issue. *See United States v. Rodd*, 966 F.3d 740, 747 (8th Cir. 2020) ("We need not determine whether the district court erred in adhering to the policy statements in § 1B1.13."). However, while it remains undecided within the Eighth Circuit whether § 1B1.13 applies to motions for compassionate release brought directly by an inmate, and therefore whether Courts consider whether the defendant remains a danger to the community, § 3582 still requires the Court to consider the § 3553(a) factors, one of which is "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Further, the Government submits even if not found to be applicable, § 1B1.13 is at the very least instructive on the pertinent issues of a motion for compassionate release. *See United States v. Pelichet*, 2020 WL 6825699, at *5 (D.S.D. Nov. 20, 2020) ("With the understanding that it is not limited by Guideline § 1B1.13, the Court will look to the Sentencing Commission's commentary notes for guidance" (*citing Rodd*, 966 F.3d at 745 (noting that the district court first analyzed the prisoner's motion under the commentary to § 1B1.13 to determine whether he satisfied the "extraordinary and compelling" reasons for compassionate release)); *United States v. Gashe,* 2020 WL 6276140 at *3 (N. D. Iowa Oct. 26, 2020) ("I agree with those courts that have found that although [§ 1B1.13] provides helpful guidance on what constitutes extraordinary and compelling reasons, it is not conclusive given the FSA's changes.").

As the proponent of a motion, the inmate bears the burden of proving both that they have satisfied the procedural prerequisites for judicial review—*i.e.*, that they have "exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on [his] behalf" or that

4

30 days have lapsed "from the receipt of such a request by the warden"—and that "extraordinary and compelling reasons" exist to support the motion. 18 U.S.C. § 3582(c)(1)(A); *see United States v. Butler*, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue."); *cf. United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) ("[A] defendant, as the § 3582(c)(2) movant, bears the burden of establishing that a retroactive amendment has actually lowered his guidelines range in his case.").

### III. **BOP Response to the Coronavirus Pandemic**

The BOP has taken significant measures to protect the health of all inmates. The BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts at the Centers for Disease Control (CDC), and in accordance with guidance from the World Health Organization (WHO). The BOP has implemented preventive and mitigation measures including:

- **Modified Operations:** The BOP has implemented modified operations to maximize social distancing in all facilities. Inmates are limited in their movements to prevent congregate gathering. Essential inmate work details, such as Food Service, continue to operate with appropriate screening.

- **Screening of Inmates and Staff:** All newly arriving BOP inmates are screened by medical staff for COVID-19. The screening includes a symptom screen, a temperature check, and an approved viral PCR test. Inmates who arrive symptomatic and/or test positive are placed in medical isolation. Inmates who arrive asymptomatic and test negative are placed in quarantine for at least 14 days and are tested before entering general population. Enhanced health screening of staff, contractors, and other visitors are performed at all BOP locations.

- **Social Visits:** Until recently all social visits were suspended. In accordance with specific guidance designed to mitigate risks, the BOP is now reinstating social visits, where possible to maintain the safety of all staff, inmates, and visitors. All visits are non-contact and social distancing between inmates and visitors is enforced. Visitors are symptom screened and temperature checked, and inmates and visitors must wear appropriate face coverings, in addition to taking other hygiene precautions. Tours continue to be suspended.

5

- **Legal Visits:** Telephone calls and/or video conferencing with outside counsel is accommodated to the extent possible. In-person legal visits are accommodated upon request, based on local resources, and face coverings are required.

In addition, the BOP has begun administering vaccines to inmates and staff and is committed to doing so as quickly as possible. To date, 297,835 doses have been administered. Further details regarding the BOP's COVID-19 action plan and efforts, and a daily updated resource page are available at: https://www.bop.gov/coronavirus/index.jsp.[1]

Taken together, these measures are designed to mitigate the risks of COVID-19 transmission in BOP institutions. BOP professionals continue to monitor this situation and adjust practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately, inmates have become ill, and there have been COVID-19 outbreaks at several institutions. Notwithstanding the current pandemic crisis, the BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider a myriad of other factors, including the availability of transportation for inmates, and of supervision of inmates once released.

---

[1] According to the resource page, due to the rapidly evolving nature of this public health crisis, the BOP will update the dashboard daily at 3:00 p.m. based on the most recently available data from across the agency as reported by the BOP's Office of Occupational Health and Safety.

6

In addition, the Attorney General has directed that the BOP prioritize transferring inmates to home confinement in appropriate circumstances when those inmates are vulnerable to COVID-19 based on CDC risk factors, and the BOP is devoting all available resources to executing that directive. On March 26, 2020, the Attorney General directed the Director of the BOP, upon considering the totality of the circumstances concerning *every* inmate, to prioritize the use of statutory authority to place prisoners in home confinement. Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), enacted on March 27, 2020, permits the BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau of Prisons,[2] to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate." Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note.) To date, the BOP has placed more than 38,245 inmates on home confinement. *See* https://www.bop.gov/coronavirus/.

Even though the Government is requesting the Court dismiss the defendant's motion, the Government is sensitive to the issues the defendant raises related to the coronavirus pandemic. The Government does not minimize the concern or the risk to inmates such as the defendant. At the present time, the BOP has taken action to mitigate the danger for all inmates. In this case, although the Government concedes that the defendant has identified CDC medical risk factors, specifically obesity and diabetes, affecting the likelihood of severe outcomes from COVID-19, after considering the applicable § 3553(a) factors, and determining that the defendant remains a

---

[2] On April 3, 2020, the Attorney General gave the Director of the BOP the authority to exercise this discretion.

7

danger to the community, as will be explained below, the Government objects to his release from custody. Moreover, the defendant has already contracted COVID-19, fully recovered, and is vaccinated against COVID-19 thus mitigating his risk which will be explained further below.

## IV. **The Defendant has Not Identified Extraordinary and Compelling Reasons**

To be entitled to compassionate release, the Court must find that the defendant has demonstrated that "extraordinary and compelling reasons warrant such a reduction," that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission," and only "after considering the factors set forth in section 3553(a)." 18 U.S.C. § 3582(c)(1)(A)(i). In *United States v. Jones,* the Sixth Circuit provided a three-step test a district court should follow when reviewing motions for compassionate release. 2020 WL 6817488, at *6 (6th Cir. Nov. 20, 2020). "At step one, a court must find whether extraordinary and compelling reasons warrant a sentence reduction. At step two, a court must find whether such a reduction is consistent with *applicable* policy statements issued by the Sentencing Commission. At step three, § 3582(c)(1)(A) instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by steps one and two is warranted in whole or in part under the particular circumstances of the case." *Id* (internal quotations and citations omitted).

The Sentencing Commission's pertinent policy statement related to extraordinary or compelling reasons appears at U.S.S.G. § 1B1.13. As amended November 1, 2018, the statement repeats the text of 18 U.S.C. § 3582(c)(1)(A) and adds that the court should reduce the sentence only if the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." Because the Eighth Circuit has not yet decided the applicability of § 1B1.13 as it relates to motions brought directly by inmates, the Government argues that it should still be considered. The BOP promulgated Program Statement 5050.50, amended effective

8

January 17, 2019, to set forth its own internal criteria for evaluating compassionate release requests. Courts have frequently upheld the BOP's discretionary authority in its management duties over federal prisoners. *See Tapia v. United States*, 564 U.S. 319, 331 (2011) ("When a court sentences a federal offender, the BOP has plenary control, subject to statutory constraints, over [the place of imprisonment and treatment programs].").

In this case, the defendant's medical records confirm[3] that the defendant has been vaccinated against COVID-19. The defendant received his first dose of the Moderna vaccine on January 7, 2021, and the second dose on February 2, 2021.[4] Because the defendant has been vaccinated, he cannot establish an extraordinary and compelling reason for release based upon concern related to COVID-19 infection. The defendant's risk is now mitigated.

The defendant's medical records also confirm he has previously contracted COVID-19. The defendant tested positive on January 6, 2022, and his medical records indicate the defendant recovered on January 19, 2022.[5] At present, the scientific community is aware of reports indicating that persons who were previously diagnosed with COVID-19 can be re-infected. (See https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html.) However, the immune response, including duration of immunity is not yet understood. In the face of scientific uncertainty concerning the likelihood of the defendant's potential reinfection, and the defendant's demonstrated capacity to overcome infection and provide self-care within the correctional setting,

---

[3] The Government has obtained the last year of the defendant's medical records from the BOP and can make the records available if required by the Court. The records are not attached as an exhibit to this pleading in order to protect the defendant's privacy.

[4] The defendant's medical records are available upon request.

[5] The defendant's medical records are available upon request.

9

the Government respectfully contends that the defendant's request for compassionate release does not articulate either an extraordinary or compelling reason for such release.

As previously discussed, the Eighth Circuit has not yet decided whether § 1B1.13 applies to motions for compassionate release brought directly by an inmate. Nonetheless, the Application Notes for § 1B1.13 are instructive and provide guidance for the Court when determining whether the defendant has demonstrated an extraordinary and compelling reason for a sentencing reduction. *See United States v. Gunn,* 2020 WL 6813995, at *1-2 (7th Cir. Nov. 20, 2020) ("The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary and compelling reasons'; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive."); *United States v. Pelichet*, 2020 WL 6825699, at *5 (D.S.D. Nov. 20, 2020) ("With the understanding that it is not limited by Guideline § 1B1.13, the Court will look to the Sentencing Commission's commentary notes for guidance." (*citing Rodd*, 966 F.3d at 745 (noting that the district court first analyzed the prisoner's motion under the commentary to § 1B1.13 to determine whether he satisfied the "extraordinary and compelling" reasons for compassionate release)); *United States v. Gashe,* 2020 WL 6276140 at *3 (N. D. Iowa Oct. 26, 2020) ("I agree with those courts that have found that although [§ 1B1.13] provides helpful guidance on what constitutes extraordinary and compelling reasons, it is not conclusive given the FSA's changes.")

**Medical Condition of the defendant.**

The application notes for U.S.S.G. 1B1.13 define medical condition of the defendant as:

Medical Condition of the Defendant.--

10

(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is--

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(U.S.S.G. § 1B1.13 Application Note 1(A).)

The defendant has made an inadequate showing of extraordinary and compelling circumstances. There is no evidence or claim that he is unable to provide self-care or perform daily living activities. In fact, the defendant freely admitted he does not require assistance with self-care such as bathing, walking, or toileting. (D.E. 48-1.) The defendant has failed to sustain his burden to prove that he meets the requirements for compassionate release or a reduction of sentence. The defendant does not have a terminal illness/suffer from any physical or mental condition that substantially diminishes his ability to provide self-care within the correctional facility. Further, although the defendant asserts, he suffers from obesity and diabetes, his risk is mitigated since the defendant is fully vaccinated. Consequently, there are no extraordinary and compelling reasons, as those terms are defined for the purpose of 18 U.S.C. § 3582(c)(1)(A), justifying compassionate release in this case.

While the Government is attune to the difficulties facing inmates, this particular instance simply fails to meet the requirements of the law and policy. 18 U.S.C. § 3582(c) does not allow a

court to modify a term of imprisonment absent extraordinary and compelling reasons that warrant such a reduction. The circumstances here do not rise to such a standard, and the defendant's request does not meet the requirements for release. In *Dillon v. United States*, 560 U.S. 817, 826, (2010) the Supreme Court determined that the sentencing court could only consider a reduction in sentencing if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission. Based upon that reasoning, U.S.S.G. § 1B1.13 Application Note 1(A) is mandatory and the defendant's request does not meet the requirements for release.]

**Other Reasons.**

The application notes for U.S.S.G. 1B1.13 define other reasons as:

Other Reasons.--

     As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

(U.S.S.G. § 1B1.13 Application Note 1(D).)

Here, the defendant has not made an adequate showing that there are extraordinary and compelling reasons to warrant a sentence reduction, nor has he argued he is at higher risk of getting sick or dying from COVID-19 based on his age or an underlying health condition. Rather, the defendant claims he needs to take care of his mother and his son. (D.E. 48.)

The defendant specifically stated as other reasons: "Mother in nursing home. I'm going to take care of her an [sic] my son at 904 East 68th Street nursing home". (D.E. 48.) These cited other reasons do not fall into the category of family circumstances – such as the caregiver of his son has died or has become incapacitated, and the defendant is the only caregiver. In this instance, the defendant provides no information regarding who is currently caring for his son nor the age of

12

his son.  Further, the defendant's mother is currently in a nursing home presumably getting the care she needs.

Also, the defendant suggested he will reside at 500 South Westmoreland Avenue, Apt. 303, in Los Angeles, California.  (D.E. 48-1.)  Without the defendant providing the city and state where his mother's nursing home is located, the Government is not sure if she is in Kansas City or in Los Angeles.  Further, the defendant does not provide where his son is currently located.  It should also be noted defendant's Presentence Investigation Report notes defendant has no reported children.  (PSR ¶ 58.)

However, the defendant admitted that his (defendant's) nephew will be available to provide assistance with the defendant's medical needs.  The defendant lists his 26-year-old nephew as living in Kansas City, Missouri.  (D.E. 48-1.)  This leads the Government to believe the defendant's mother and purported son currently reside in Kansas City, Missouri as well. The Government is unsure how the defendant can help care for his mother and son and receive assistance for his own medical care from his nephew if he is located half-way across the United States from them.  The defendant has failed to present any other extraordinary or compelling circumstances that would justify early release.

## V. Defendant Remains a Danger to the Community and Section 3553(a) Factors Do Not Support Release

This Court may not modify or reduce the defendant's sentence without considering the 18 U.S.C. § 3553(a) factors, including the nature and circumstances of the offense and history and characteristics of the defendant; the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct;  to protect the public from future crimes of the defendant; and to provide the

13

defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.[6] 18 U.S.C. § 3582(c); *see also United States v. Jones*, 2020 WL 6817488, at *11 (6th Cir. Nov. 20, 2020) (citing *Gall v. United States*, 552 U.S. 38 (2007) ("District courts should consider all relevant § 3553(a) factors before rendering a compassionate release decision."). Consideration of these factors, which are not affected by COVID-19, does not allow the Court to grant the defendant's motion for compassionate release.

After considering the factors set forth in § 3553(a), and the relevant policy statement, a reduction in the defendant's sentence is not warranted and the defendant's motion should be denied. The § 3553(a) factors include:

(1) nature and circumstances of the offense and the history and characteristics of the defendant. § 3553(a)(1).

**Nature and circumstances of the offense.**

On November 18, 2007, Kansas City, Missouri police officers were dispatched to the residence of Joy Williams due to a disturbance. Ms. Williams told officers the defendant assaulted her. (PSR ¶ 9.) Earlier in the evening, Ms. Williams and the defendant were involved in a verbal altercation and the defendant hit her in the face with his fist. Ms. Williams left in her vehicle and the defendant chased her on the highway in his vehicle attempting to "run her off the road" several times. The defendant arrived at Ms. Williams' residence soon after which he jumped out of his

---

[6] U.S.S.G. § 1B1.13(2), states that even if a prisoner demonstrates "extraordinary and compelling reasons," he is not entitled to compassionate release if he poses "a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." As discussed above, Courts are divided as to whether § 1B1.13 applies outside the context of a motion filed by the BOP. However, § 3582 unquestionably requires the Court to consider the § 3553(a) factors, which encompasses the arguments the Government has raised with regard to the defendant's presentation of a danger to the community and the need to protect the public.

14

vehicle and fired a shot into the air. Ms. Williams fled. She returned home later to find the defendant had fired shots into her two televisions and her dresser mirror. (PSR ¶ 10.)

On November 28, 2007, Kansas City, Missouri police officers were dispatched to Ms. Williams' residence on a recovered property call. Ms. Williams said the defendant had assaulted her again. Ms. Williams said that on November 27, 2007, she agreed to meet the defendant at a different location where he tried to persuade her to get out of her vehicle. She refused and he displayed a gun again. She then fled and the defendant fired at her vehicle deliberating aiming at and hitting her car near the gas tank. (PSR ¶ 11.)

Upon her return to her residence, the defendant emerged from the side of the house, grabbed her by the hair, and stuck a gun to her face. Ms. Williams said the defendant told her he was trying to shoot her gas tank to blow her up. (PSR ¶ 12.) The defendant forced her to the basement and threatened to shoot her and her children in the head repeatedly as he struck her in the face with his hands and held a gun to her head. The defendant held her at gunpoint for about 25 to 30 minutes until her mother called the police. The police arrived and arrested the defendant for outstanding city warrants but could not find the gun. (PSR ¶ 13.)

On November 29, 2007, the defendant was released on his city warrants but was re-arrested and held for questioning in connection to the assault. The defendant waived his *Miranda* rights and admitted on November 18, 2007, he shoved his finger into Ms. Williams' face and broke her cell phone. The defendant also admitted to firing shots inside the victim's residence at two televisions and a mirror. (PSR ¶ 14.)

The defendant further admitted on November 27, 2007, he fired a handgun multiple times at Ms. Williams' vehicle, and while at her home, he waved a handgun in front of the victim and threatened to kill her, her children, and himself. (PSR ¶ 15.) On November 29, 2007, detectives

15

from the Kansas City, Missouri police department executed a Jackson County search warrant of Ms. Williams' residence. During the execution of the search warrant, a black Smith and Wesson, .380 caliber handgun was recovered in the residence. They also located a spent round, a black jacket, black pants, and a dark colored glove. (PSR ¶ 16.)

Alcohol, Tobacco, Firearms, and Explosives joined the investigation and determined the firearm was most likely manufactured in Massachusetts. Therefore, the firearm had been transported in interstate commerce. (PSR ¶ 17.)

**History and characteristics of the defendant.**

The defendant began his criminal career very early in life. His first conviction occurred when he was only 13 years old. The defendant was convicted of robbery. Three years later, on April 15, 1996, "the defendant was found to be unamenable to the treatment and correction offered by the juvenile system and was certified based on details of the offenses of robbery in the 1st degree and assault in the 2nd degree". (PSR ¶ 35.) That lead to his first adult conviction in which the defendant was certified as an adult at the age of 16 for robbery in the second degree. (PSR ¶ 36.)

A few months later, the defendant was convicted of trafficking drugs in the first degree. In this case, the defendant sold 3.17 grams of crack cocaine for $200 to an undercover detective. The defendant pled guilty and was sentenced to ten years in custody. While in the Missouri Department of Corrections ("MDC") custody, the defendant incurred several violations to include creating a disturbance, assault, sexual misconduct, possession/use of a controlled substance, violation of institutional rules, threats, and fighting. (PSR ¶ 37.)

At the age of 17, the defendant pled guilty to robbery, armed criminal action, and assault in the first degree. In this case, the defendant produced a handgun and demanded the victim's

16

jacket and money. About 15 minutes later, the defendant approached three victims and demanded their shoes after he produced the handgun. (PSR ¶ 38.)

While incarcerated for these offenses (and while he was 22 years of age), the defendant was convicted of attempt to commit violence against an employee of MDC. The defendant grabbed the MDC officer's key chain with handcuff and padlock keys and pulled his arm into the chuck hole. The defendant ripped the officer's glove and cut the officer's hand with his fingernails. (PSR ¶ 39.) There are several other arrests occurring while he was a juvenile and after the defendant was released from prison in 2007. These arrests include simple assault in which he hit a female victim in the face with his fists, several traffic offenses, animal violation, and domestic simple assault. (PSR ¶ 42 - 53.)

As for substance abuse, the defendant reported using 2 to 3 ecstasy pills every weekend in 2007. Further, the defendant reported beginning to use marijuana at the age of 16 and continuing to use daily until he was incarcerated in January 1998. (PSR ¶ 61 - 62.)

(2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; *to protect the public from further crimes of the defendant*; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. § 3553(a)(2)(A)-(D) (emphasis added).

As detailed above, the defendant has a long history of criminal conduct throughout his life. Many of his offenses include some form of violence and a firearm – like the conduct at the core of the instant offense. The defendant completed a lengthy sentence in custody, but he clearly did not learn respect for the law nor others as he committed the instant offense shortly after being released from custody. The public deserves to be protected from further crimes of the defendant.

17

Additionally, the defendant will receive additional educational or vocational training to help him learn the skills needed to be a productive citizen upon release from his sentence. The defendant claims he will get a job upon release (D.E. 48-1) but he needs the skills to do so.

(3) the kinds of sentences available. § 3553(a)(3).

The statutory provisions were not less than 15 years, but not more than life. (PSR ¶ 71.)

(4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress; and that except as provided in section 3742(g), are in effect on the date the defendant is sentenced § 3553(a)(4)(A).

With a total offense level of 31 and criminal history category of VI, the guideline's sentencing range was 188 to 235 months. (PSR ¶ 72.)

Further, U.S.S.G. § 1B1.13 directs Courts to also consider the factors outlined in 18 U.S.C. § 3142(g) to determine whether the defendant remains a danger to the community. Under 18 U.S.C. § 3142(g), the Court must consider four factors in determining whether the defendant might present a danger: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court, and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4). Consideration of these factors— which are not affected by COVID-19—should lead this Court to reasonably conclude that this defendant remains a danger to the safety of other persons and/or the community.

18

Nothing about the COVID-19 pandemic reduces the defendant's danger to others nor minimizes other § 3553(a) factors. Defendant's stated justifications i.e., the need to care for his son and mother do nothing to minimize his danger to the safety and wellbeing of others. Nor does it qualify as an extraordinary or compelling reason warranting his release. The defendant needs to fully complete his sentence and thereby give him the necessary time to reflect upon the seriousness of his crimes and thereby further deter similar criminal activity in the future. Simply stated, the defendant has not provided any extraordinary nor compelling reasons for release. The defendant has failed to demonstrate that the 18 U.S.C. § 3553(a) factors the Court considered at the time of sentencing have changed, nor has he shown that he is no longer a danger to the community, therefore this Court should deny this *pro se* motion for release.

## VI. <u>Record of Rehabilitation is Not an Extraordinary and Compelling Reason</u>

Finally, the defendant asserts he has demonstrated a record of rehabilitation, and the Government does not dispute that the accomplishments the defendant has made in prison, as listed and documented within his motion (D.E. 48), are laudable. However, rehabilitation of a defendant is not, by itself, an extraordinary and compelling reason supporting any reduction of a term of imprisonment. (U.S.S.G. § 1B1.13 Commentary n.3; 28 U.S.C. § 944(t).)

19

## **CONCLUSION**

Based upon the foregoing, the Government respectfully requests that the defendant's *pro se* motion for compassionate release be denied.

Respectfully submitted this 2nd day of March 2022.

Teresa A. Moore
United States Attorney

By     */s/ Stefan C. Hughes*

Stefan C. Hughes
Assistant United States Attorney

Charles Evans Whittaker Courthouse
400 East Ninth Street, Suite 5510
Kansas City, Missouri 64106
Telephone: (816) 426-3122

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on March 2, 2022, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record and defendant at:

Michael Patterson, *Pro Se*
Reg. No. 20664-045
Victorville Medium I
Federal Correctional Institution
P.O. Box 3725
Adelanto, California, 92301

*/s/ Stefan C. Hughes*
Stefan C. Hughes
Assistant United States Attorney